# United States Court of Appeals

*for the*

# Eleventh Circuit

---

BERNARD R. PEREZ,
*Appellant*,

v.

MONY LIFE INSURANCE COMPANY,
and DISABILITY MANAGEMENT SERVICES, INC.,
*Appellees*.

---

ON APPEAL FROM FINAL JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CASE NO. 8:19-CV-02031-WFJ-TGW

## APPELLANT'S INITIAL BRIEF

Timothy W. Weber, Esq.
Jeremy D. Bailie, Esq.
Weber, Crabb & Wein, P.A.
5453 Central Avenue
St. Petersburg, Florida 33710
(727) 828-9919
*Counsel for Appellant*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to 11th Cir. R. 26.1-1(a)(2), Appellant hereby files this *Certificate of Interested Persons and Corporation Disclosure Statement* as follows*:*

1. Bailie, Jeremy D. – counsel for Appellant (Defendant/Counter-Plaintiff in the underlying action)

2. Corless, Theodore – counsel for Appellant (Defendant/Counter-Plaintiff in the underlying action)

3. Disability Management Services, Inc. – Appellee (Counter-Defendant in the underlying action.)

4. Jung, Hon. William F. – (District Court Judge)

5. Lamoureux, Mary Catherine – former counsel for Defendant/Counter-Plaintiff in the underlying action)

6. Landau, Jeffrey M. – counsel for Appellees (Plaintiff/Counter-Defendants in the underlying action)

7. Meagher, John E. – counsel for Appellees (Plaintiff/Counter-Defendants in the underlying action)

8. Monk, Jake – counsel for Appellees (Plaintiff/Counter-Defendants in the underlying action)

9. MONY Life Insurance Company, f/k/a The Mutual Life Insurance Company of New York – Appellee (Plaintiff/Counter-Defendant in the underlying action)

10. Ogden & Sullivan, P.A. – former law firm representing Plaintiff/Counter-Defendants in the underlying action

11. Perez, Bernard R. – Appellant (Defendant/Counter-Plaintiff in the underlying action)

12. Protective Life Insurance Company – non-party (Petitioner MONY Life Ins. Co. is a wholly owned subsidiary of Protective Life Ins. Co.)

13. Rodriguez, Julissa – counsel for Plaintiff/Counter-Defendants in the underlying policy action

14. Shutts & Bowen, LLP – law firm representing Appellee (Plaintiff/Counter-Defendants in the underlying action)

15. Sullivan, Timon V. – prior counsel for Plaintiff/Counter-Defendant in the underlying action

16. Weber, Timothy W. – counsel for Appellant (Defendant/Counter-Plaintiff in the underlying action)

17. Weber, Crabb & Wein, P.A. – law firm representing Appellant (Defendant/Counter-Plaintiff in the underlying action)

18. Wilson, Susan M. – prior counsel for Plaintiff/Counter-Defendants in the underlying action

19. Wilson, Hon. Thomas G. – (Magistrate Judge)

I hereby certify that no publicly-traded company or corporation has an interest in the outcome of the appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument as this case turns on issues of state law which necessitate discussion between counsel and the Court to fully elaborate. The case involved protracted litigation in multiple courts, a jury trial spanning 9 days over 3 weeks, and tens of thousands of pages of documentary evidence.

# **TABLE OF CONTENTS**

STATEMENT REGARDING ORAL ARGUMENT ............................................... ii

TABLE OF CONTENTS .............................................................................. iii

TABLE OF CITATIONS ...............................................................................v

STATEMENT OF JURISDICTION ................................................................. viii

STATEMENT OF THE ISSUES ..............................................................1

STATEMENT OF THE FACTS AND CASE ..........................................................2

SUMMARY OF THE ARGUMENT ...........................................................24

ARGUMENT .........................................................................................27

    I.   THE DISTRICT COURT'S REFUSAL TO INTERPRET THE
       INSURANCE POLICY WAS ERROR MANDATING REVERSAL
       ON ALL ISSUES; THE POLICY COULD NOT REASONABLY
       HAVE BEEN INTERPRETED TO AUTHORIZE MONY'S
       DEMANDED AUDIT ...............................................................27

    II.  THE DISTRICT COURT'S ENTRY OF FINAL JUDGMENT ON
       MONY'S UNJUST ENRICHMENT CLAIM WAS ERROR WHERE
       THERE WAS AN EXPRESS CONTRACT FOR THE PAYMENT
       OF BENEFITS, VOLUNTARY PAYMENT BY MONY UNDER
       THE CONTRACT, AND WAIVER OF MONY'S RIGHT TO
       CLAIM REIMBURSEMENT ...................................................33

       **A.**    **Unjust enrichment cannot lie where there is an express
              contract between the parties on the subject matter**...................33

       **B.**    **In the absence of fraud or mistake, Florida law does not
              allow an insurer to sue its insured to re-adjust an
              insurance claim; such a right would alter the risks both
              parties assumed in the insurance contract and inject
              uncertainty and litigation into every claims decision**................40

**C.** **The district court erred in refusing to direct a verdict in Dr. Perez's favor based on the voluntary payment doctrine** ..............................................................................45

**D.** **MONY intentionally waived its right to seek reimbursement when it paid Dr. Perez without a reservation of rights; the district's court failure to direct a verdict in favor of Dr. Perez based on waiver was similarly error.** ...............................................................46

III. THE DISTRICT COURT ABUSED ITS DISCRETION IN OVERLOOKING MONY'S REPEATED ABUSE OF THE PRETRIAL PROCESS AND ALLOWING IRRELEVANT MEDICAL EXPERT TESTIMONY .......................................49

CONCLUSION .......................................................52

CERTIFICATE OF COMPLIANCE ...................................53

CERTIFICATE OF SERVICE...........................................54

# **TABLE OF CITATIONS**

## **CASES**

*American Safety Ins. Serv., Inc. v.* Griggs,
  959 So.2d 322 (Fla. 5th DCA 2007) ............................................................36

*Ameritas Variable Life Ins. Co. v. Roach*,
  411 F.3d 1328 (11th Cir. 2005) ...................................................................10

*Berry v. Budget Rent-A-Car Systems, Inc.*,
  497 F. Supp. 2d 1361 (S.D. Fla. 2007) ........................................................34

*Brillhart v. Excess Ins. Co. of Am.*,
  316 U.S. 491 (1942) .....................................................................................10

*Bryant v. Norde*,
  2018 WL 4378165 (E.D. N.Y. 2018) ...........................................................50

*Canal Ins. Co. v. Giesenschlag*,
  454 So.2d 88, 89 (Fla. 2d DCA 1984) .........................................................29

*Davis v. National Medical Enterprises, Inc.*,
  253 F.3d 1314 (11th Cir 2001) ....................................................................28

* *Diamond "S" Development Corp. v. Mercantile Bank*,
  989 So. 2d 696, 697 (Fla. 1st DCA 2008) ..............................................33, 35

*Excess Underwriters at Lloyd's, London v. Frank's Casing Crew&
  Rental Tools, Inc.*,
  246 S.W.3d 42, 50 (Tex. 2008) ....................................................................43

* *Glob. Network Mgmt., LTD. v. Centurylink Latin Am. Sols., LLC*,
  67 F.4th 1312 (11th Cir. 2023) ...............................................................34, 35

*Gulf Tampa Drydock Co. v. Great Atlantic Ins. Co.*,
  757 F.2d 1172 (11th Cir. 1985) ...................................................................28

*Hartnett v. Southern Insurance Co.*,
  181 So.2d 524, 528 (Fla.1965) .....................................................................29

*Insurance Co. of N. America v. Lexow*,
   937 F.2d 569 (11th Cir. 1991) ..................................................................28

*Lawyers Title Ins. Corp. v. JDC (America) Corp.*,
   52 F.3d 1575 (11th Cir. 1995) .................................................................28

*Ocean Communications, Inc. v. Bubeck*,
   956 So. 2d 1222 (Fla. 4th DCA 2007) ..................................................35

\*    *U.S. Fid. & Guar. Co. v. U.S. Sports*,
   270 P.3d 464 (Utah 2012) ..............................................................42, 44

\*    *Washington Nat. Ins. Corp. v. Ruderman*,
   117 So.3d 943 (Fla. 2013) ........................................................28, 29, 30

*Wilson v. EverBank, N.A.*,
   77 F.Supp.3d 1202 (S.D. Fla. 2015) ......................................................34

*Wilton v. Seven Falls Co.*,
   515 U.S. 277 (1995) ..................................................................................10

## STATUTES

§ 20.121(3)(a)1, Fla. Stat. .................................................................................40

§ 627.404(5), Fla. Stat. (2020) .........................................................................41

§ 627.410, Fla. Stat. ............................................................................................41

§ 627.412, Fla. Stat. ............................................................................................41

§ 627.413(1)(c), (f), Fla. Stat. ..........................................................................41

§ 627.425, Fla. Stat. ............................................................................................42

UTAH CODE § 31A-21-106(1)(a) ...................................................................43

## OTHER AUTHORITIES

42 C.J.S. Implied Contracts § 62 (2023 update) ....................................35, 36

Advisory Committee Notes to Fed. R. Civ. P. 26 (2000 Amendments) .................49

## **RULES**

Fed. R. Civ. P. 26(a)(1)(A)(ii) ....................................................................49

Fed. R. Civ. P. 26(a)(1)(A)(iii) ..................................................................49

Fed. R. Civ. P. 26(a)(2)(D)(ii) ...................................................................17

Fed. R. Civ. P. 26(e)(1)(A) ........................................................................49

## STATEMENT OF JURISDICTION

This is an appeal from a final judgment of the United District Court for the Middle District of Florida in a civil action. The district court had jurisdiction under 28 U.S.C. § 1332 based on diversity of citizenship. (Doc. No. 1, at 1-2; Doc. 1-1; Doc. 191).[1] The district court's final judgment was entered on December 14, 2022, (Doc. 426), and Dr. Perez timely filed a Rule 50(b) and Rule 59 motion on January 11, 2023, (Doc. 428), which was finally disposed of on February 14, 2023. (Doc. No. 433) Dr. Perez timely filed his notice of appeal on March 8, 2023. (Doc. 436) This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

---

[1] At one point in the proceedings, MONY was permitted to amend its pleadings and alternatively claim jurisdiction based on 28 U.S.C. § 1331 by asserting ERISA governance and preemption of the dispute. (Doc. 159, at 2) However, the district court granted summary judgment in favor of Appellant and against MONY on its ERISA claim, finding ERISA was inapplicable to this action. (Doc. 286)

## STATEMENT OF THE ISSUES

I.    Whether the policy authorized MONY to audit the insured's medical practice for purposes of redetermining coverage for prior paid disability claims.

II.   Whether MONY breached the policy by demanding to audit the insured's medical practice for purposes of redetermining coverage for prior paid disability claims as a condition of further performance under the policy.

III.  Whether the district court's failure to interpret the insurance policy and properly instruct the jury mandates a new trial on all issues.

IV.   Whether MONY can recoup benefits paid under the policy on a theory of unjust enrichment where there was an express contract between the parties, MONY voluntarily paid Dr. Perez under the contract without a reservation of rights, and MONY agents testified that MONY intended to waive its right to reimbursement by making payment without a reservation of rights.

V.    Whether the district court abused its discretion in permitting MONY to ambush Dr. Perez on its unjust enrichment claim by failing to disclose the basis of its claims or the calculation of damages during discovery and allowing irrelevant medical testimony to mislead the jury.

## STATEMENT OF THE FACTS AND CASE

In 1988, Dr. Perez purchased a policy of long-term disability insurance issued by MONY (Policy No.: 88x2-28-91) (the "Policy") intended to provide income replacement benefits in the event Dr. Perez became unable to perform his occupation as an ophthalmic surgeon (Total Incapacity) or unable to perform as much work as he had previously performed (Residual Income Loss). Dr. Perez maintained the premiums through 2011 when he was diagnosed with throat cancer (Metastatic Squamous Cell Carcinoma of the Throat) and underwent an aggressive course of proton beam radiation therapy. While it saved his life, the radiation damaged nearly everything else in the treatment field, including his saliva glands, thyroid, and epiglottis.

In June 2011, Dr. Perez gave MONY notice of his claim for benefits; MONY responded[2] by providing claim forms to Dr. Perez. (Doc. 442, at 181) MONY began paying benefits to Dr. Perez, initially determining Total Incapacity for four months and then determining he was eligible for Residual Income Loss benefits. (Doc. 211, at 4). For seventy-seven (77) months, from August 2011 through and including December 2017, Dr. Perez submitted proofs of loss to MONY on its claim forms,

---

[2] MONY never actually responded to Dr. Perez. Disability Management Services, Inc. ("DMS") responded to Dr. Perez representing that it had the authority to handle the claim for MONY. The actions of MONY described in this lawsuit were all actions of DMS but will be referred to for convenience as MONY.

and MONY paid Dr. Perez benefits pursuant to the Policy. (Doc. 423-4 through 423-13, 423-15 through 423-26, 423-29 through 423-40, 423-42 through 423-53, 423-55 through 423-66, 423-68 through 423-79). MONY also paid Dr. Perez's January 2018 claim, but this payment was made under a full reservation of rights. (Doc. 423-211) (expressly reserving "the right to disclaim coverage and the right to request the return of benefits paid to Dr. Perez to which we may determine later that he was not entitled"). As with the prior months, Dr. Perez submitted completed claim forms for the month of February 2018. (Doc. 211, at 6) (admitting that Dr. Perez submitted claim forms for February 2018).

### The Policy Determinations

The submission of claims and calculation of benefits owed is set forth in the Policy. (Doc. 510-1) The determination of earnings loss is a four-step process: (1) determine earnings prior to Sickness; (2) determine current earnings; (3) subtract current earnings from prior earnings (adjusted for inflation) and express the loss as a percentage of prior earnings; and (4) determine whether the earnings loss is due solely to Injury or Sickness. (Doc. 510-1 at 5)

The Policy defines the term "Prior Earnings," which is the baseline earnings prior to the date of disability (referred to in the Policy as the "Onset Date"). The Policy defines the Prior Earnings as:

[Y]our average monthly Earnings times the Earnings Multiplier. That
average will be the higher of your average monthly Earnings from the
following periods:

(a) the 12 fiscal months preceding the Onset Date;
or
(b) the highest 2 consecutive tax years of the last 5 tax years.

(Doc. 510-1 at 5). In March of 2012, MONY advised Dr. Perez it had calculated his

Prior Earnings based upon the highest 2 consecutive tax years in the 5 years

preceding the Onset Date (2009 and 2010) and provided its calculation worksheet

setting forth its Prior Earnings calculation of $28,314.00 per month. (Doc. 423-1 at

4). In performing its calculation, the salary paid to Dr. Perez by the practice was

subtracted from the "Total Expenses" to reach "Adjusted Expenses." (Doc. 423-1 at

4). "Adjusted Expenses" was then subtracted from "Gross Receipts" to determine

"Earnings." (Doc. 423-1 at 4) According to MONY's expert forensic accountant,

John Hoffman, CPA, MONY's calculation of "Earnings" disregarded what he was

actually paid in salary by the practice. (Doc. 443, at 175)

For each monthly benefit period, MONY determined the "Current Earnings"

using the same methodology – subtracting the salaries of the physicians from "Total

Expenses" to obtain "Adjusted Expenses" and then subtracting Dr. Perez's 50%

share of Adjusted Expenses from his actual monthly production figure. (Doc. 510-

145). Notably, MONY's methodology for calculating Earnings Loss that

disregarded his salary was contrary to the Policy; according to MONY's witnesses,

this was the way they had been doing it for decades and no one told them it was incorrect. (Doc. 443 at 205). MONY did not claim its calculations were a mistake at trial. (Doc. 443 at 224).

The Policy defines "Percent of Earnings Loss" as any month where the Current Earnings are less than the Prior Earnings, expressed as a percentage. (Doc. 510-1 at 5). In the event the loss continues for a period greater than 60 days, the Policy requires Current Earnings to be calculated using a rolling six-month average. (Doc. 510-1 at 5). For example, in determining the benefit for February of 2018, the rolling average would require an analysis of Earnings for the months of September 2017 to February 2018. (Doc. 443 at 143-144)

If the insured suffers an Injury or Sickness, the insured provides notice of claim to MONY. (Doc. 510-1 at 7). Once MONY receives the notice of claim, it may provide claim forms to the insured within fifteen (15) days for the insured to submit proof of loss. (Doc. 510-1 at 7) If MONY fails to provide claim forms, the Policy deems the insured to "have met the Proofs of Loss requirements if [the insured] send[s] [MONY] written proof of the nature and extent of the [insured's] loss." (Doc. 510-1 at 7). Thus, the Policy deems Proofs of Loss to be sufficient in form by either submission of the completed claim forms or written proof of the nature and extent of loss. (Doc. 510-1 at 7) The Policy provides that Proofs of Loss must be given to MONY at its Home Office. (Doc. 510-1 at 7) It also specifies that

MONY may have the insured physically examined as often as it may reasonably require while a claim continues. (Doc. 510-1 at 7). Upon submission of Proof of Loss by the insured, MONY determines whether the proofs constitute "acceptable proof of loss" within the meaning of the Policy.

The Policy specifies when MONY pays claims:

> When We Pay Claims – First we need written proof of loss. **Upon receipt of acceptable proof of loss, we will pay all benefits due you at the end of each month while the benefit period continues.** Any balance not paid when the benefit period ends will be paid upon receipt of proper written proof.

(Doc. 510-1 at 7) (emphasis supplied).

The Policy contains no provision requiring the insured to produce additional documents upon demand, to execute a blanket authorization for the release of information by third parties, or to permit wide-ranging audits of the insured or non-party medical practice. The insured selects and provides his "proof of loss," and MONY determines whether such proof, for each month submitted, constitutes acceptable proof of loss.

*MONY'S Audit Demands*

By letter dated November 14, 2016, MONY advised Dr. Perez "we will be moving forward with an independent forensic financial audit of your practice by an outside accounting firm." (Doc. 423-234 at 78) On March 1, 2017, Senior Claim Consultant Thomas M. Jolicoeur advised Dr. Perez that he wanted to meet in person

and would be available to answer questions regarding "the pending on-site financial audit that recently commenced." (Doc. 423-234 at 231) On May 23, 2017, MONY wrote Dr. Perez of its intention to have Nawrocki Smith, a consulting firm captive to the disability industry, perform an on-site audit of the medical practice. (Doc. 423-234 at 77) On June 8, 2017, the "independent" auditor wrote directly to Dr. Perez with a detailed list of information it was seeking prior to visiting the practice, including an electronic backup copy of the firm's accounting data, detailed general ledgers for 2006-2017 YTD, all W-2's and 1099's from 2006 to 2017 YTD (with job descriptions of reach employee), and copies of all agreements with the practice from 2006 to 2017 YTD. (Doc. 423-234 at 72) The letter also requested supporting receipts and documents for various expense categories from 2006 to 2017 YTD, access to all patient files and records (including patient notes), as well as the practice's billing system. (Doc. 423-234 at 71-73)

On July 12, 2017, MONY followed up, this time threatening that "Absent moving forward and your compliance with the financial audit and you providing Nawrocki Smith with all of the proof of loss documentation necessary to complete their review, *we will be left with little alternative but to suspend future benefits.*" (Doc. 423-235 at 399). The letter indicated, "[i]n the meantime, enclosed is a check representing Residual Income Loss benefits due for June 2017." (Doc. 423-235 at 399)

On December 22, 2017, Dr. Perez, through counsel, addressed the forensic audit and invited MONY to identify the provision of the Policy authorizing it to audit prior benefit periods that were already paid and closed. (Doc. 423-235 at 645) MONY responded, stating:

> [W]e advised Dr. Perez that we would be moving forward with an independent forensic audit of his practice, at our expense, by an outside accounting firm. While the Policy does not specifically mention this method of obtaining the acceptable Proof of Loss, logically, this appears to be the only means under which Dr. Perez will be able to provide it.

(Doc. 423-235 at 58).

Dr. Perez submitted his claim for benefits for February 2018. On May 31, 2018, Dr. Perez's counsel made inquiry regarding the claim payment for February 2018. (Doc. 423-235 at 334) MONY advised Dr. Perez, by letter dated May 31, 2018, that it was not only demanding the audit but it was refusing to provide any additional benefits until it received the same. (Doc. 423-235 at 333) The May 31, 2018 letter advised that MONY was demanding the audit to determine Dr. Perez's entitlement to benefits since the Onset Date, June 2011. (Doc. 423-235 at 333). It stated:

> Since the information requested by Nawrocki Smith has been outstanding since 2017, please provide Nawrocki Smith the documentation noted on page 1 of this letter within 30 days *so we may expedite the on-site audit and determine Dr. Perez's eligibility for benefits since the onset date. Absent receipt of this documentation, along with the documented noted on page 2 & 3 to DMS, we will be*

*unable to provide additional benefits until acceptable proof of loss is
provided.*

(Doc. 423-235 at 333) (emphasis supplied).

On July 3, 2018, MONY reminded Dr. Perez that compliance with its
demands was "necessary for our continued evaluation of Dr. Perez's eligibility for
disability benefits under the terms of his policy." (Doc. 423-214). At trial, MONY's
corporate representative, Carol Walsh, CPA, could not identify a provision of the
Policy providing for an audit:

> Q      Is there anything in this policy in order to access the
> benefit that says the company that Ben Perez works for has to submit
> to a complete audit of all of its patient records, its financials, its
> production data, anything of that nature?
>
> A      There is not.

(Doc. 442 at 189).

Dr. Perez filed suit against MONY in state court seeking a declaration that
MONY was not entitled to condition processing of benefit claims on Dr. Perez's
acquiescence to MONY's demand for a retrospective forensic audit and the
provision of voluminous materials beyond its claim forms each month. (Doc. 1-3)
MONY removed the action to the district court based on diversity. (Doc. 11 at 2)
After it became apparent to Dr. Perez that the district court would not promptly
resolve the discrete issue of MONY's entitlement to the audit under the Policy, Dr.

Perez voluntarily dismissed the removed action, over MONY's objection. (Doc. 11 at 3)

Dr. Perez filed a second action in state court alleging MONY breached the contract of insurance by withholding benefits for the month of February 2018. (Doc. 1-4). MONY filed an answer and defenses but no counterclaim. (Doc. 9, at 4) However, still desiring a federal forum, MONY filed the instant action against Dr. Perez, ironically seeking a declaration that it was entitled to condition processing of future benefit claims on Dr. Perez's acquiescence to its demanded audit. (Doc. 1). In addition to seeking an abatement, Dr. Perez moved to dismiss and asked that the district court decline to exercise jurisdiction over MONY's declaratory judgment action pursuant to *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491 (1942), *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995), and *Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328 (11th Cir. 2005). (Doc. 9).

The district court initially abated the action in favor of the state court proceeding, (Doc. 23), but not before observing that the Policy did not appear to authorize MONY's audit demand:

> And so it's like, well, gee, Judge, you know, to some extent it's whatever we want and we want this audit including all the patients' records. We will get ourselves HIPAA compliant and you can give us all of your patient records. And even though we didn't -- with one line in the policy, you could have said you will provide a forensic audit that's required by us and provide documents we demand to so audit, but you didn't put

that in there. And so, you know, you want me to put that in there. And
I don't write insurance policies.

(Doc. 24, at 3:13—24). The district court also commented on the meaning of the

term "acceptable proof of loss" in the Policy, stating that "[a]nd hopefully there is

some law on point, which I haven't seen yet if we ever get there, that says, oh, yeah,

proof of acceptable demand can include a forensic audit from the Book of Genesis."

(Doc. 24, at 4)[3] Unfortunately, the district court's initial comments were as close as

the district court would ever get to deciding whether the Policy authorized MONY's

demanded audit.

MONY filed an Amended Complaint adding two damages claims against Dr.

Perez claiming that Dr. Perez may have been unjustly enriched by the receipt of

benefits to which he was not entitled and that its requested audit might show it. (Doc.

13) Dr. Perez moved to dismiss the unjust enrichment and restitution claims on the

ground that MONY did not dispute the existence of the written contract between the

parties and that the existence of an express written contract precluded these claims.

(Doc. 16 at 20). Dr. Perez also sought summary judgment on MONY's action for

declaratory relief, asking the district court to determine that the Policy did not

authorize MONY's demanded audit. (Doc. 16 at 22-25)

---

[3] The district court remarked that the demanded audit is not only "remarkably broad"
but it is "an entitlement that you chose not to sell in your policy or to write, and you
could have done it with one sentence." (Doc. 24 at 4:18—20).

MONY next filed a Second Amended Complaint, abandoning its original declaration request concerning the audit. (Doc. 42-43). Dr. Perez again moved to dismiss and alternatively requested summary judgment based on the Policy dispute. (Doc. 44). Dr. Perez also asserted that MONY's unjust enrichment and restitution claims failed as a matter of law absent fraud or mistake, neither of which was pled with the particularity required by Fed. R. Civ. P. 9(b). Dr. Perez noted that the only high court to address this issue, the Utah Supreme Court, rejected unjust enrichment claims by insurers seeking to redetermine coverage decisions already made because (1) a claim for unjust enrichment cannot arise where there is an express contract; and (2) an insurer may only seek restitution "when the right is expressly provided in their insurance agreement." (Doc. 44 at 14-15).

The district court entered a docket entry order largely avoiding any of the legal issues. (Doc. 47) It stated that the second amended complaint surmounted the low bar of notice pleading, that "the defenses are clear to the Court insofar as the Court has reviewed everything Dr. Perez has filed to date, and the Court has received argument from both sides," and that the Court does not wish to delay or to impair progress of matters in County Court nor interfere there in any manner. (Doc. 47) The Court denied Dr. Perez's motion for summary judgment regarding the interpretation of the Policy "without prejudice." (Doc. 47). Dr. Perez was directed to file his answer, defenses, and any counterclaim. (Doc. 47)

Dr. Perez counterclaimed for breach of contract, bad faith, and fraud, adding

Disability Management Services (DMS) as an additional party defendant. (Doc. 51)

After the district court denied MONY's and DMS's motion to dismiss the bad faith

counterclaim, they filed a petition for mandamus and for writ of prohibition in this

Court, which was denied. *See MONY v. Perez*, 20-14533-G (Order dated January 25,

2021) (denying petition).

MONY later filed its operative Third Amended Complaint alleging generally

that between 2011 and 2018 Dr. Perez received benefits under the Policy to which

he was not entitled. MONY alleged that Dr. Perez's production was improving by

2015 and that, as a result, he qualified for less than 100% of the monthly benefit for

several months. MONY alleged that after he failed to qualify for a full benefit for

several months, Dr. Perez began submitting financial statements with increased

expenses in order to continue to qualify for benefits. MONY did not identify which

expenses were increased nor explain why it decided to continue paying claims

despite his production allegedly rebounding and his reported expenses being

inflated. Finally, MONY alleged that in 2016 it engaged an independent physician

[Dr. Brodner] to conduct a record review and the physician ultimately determined

that Dr. Perez's condition should not restrict him from performing the duties of his

occupation.[4]  Notably, MONY was provided, prior to paying each monthly claim, Dr. Perez's production data, the financial statements allegedly containing the increased expenses, and, beginning in 2016, Dr. Brodner's opinion.

*Hiding The Ball*

Dr. Perez initiated discovery on MONY's claims. He served interrogatories asking for the facts supporting MONY's unjust enrichment and restitution claims. MONY answered by referring Dr. Perez back to its [second amended] complaint. (Doc. 258-1) In the interrogatories, however, MONY affirmed its prior calculations of earnings loss and offered no different calculation for the 6 months prior to February 2018. (Doc. 258-1 at 4-6)

MONY also served Rule 26 disclosures; when asked to disclose its computation of damages, MONY answered "The precise amount of damages is undetermined.  As discovery is ongoing, Plaintiff/Counter-Defendants reserve the right to supplement this section as more information becomes available." (Doc. 258-2 at 10) MONY served supplemental Rule 26 disclosures containing the exact same

---

[4] Dr. Perez did not claim that he was unable to perform the regular and material duties of his occupation, which was the definition of Total Disability under the Policy. Dr. Perez claimed benefits under a separate coverage, for which he paid an additional premium, which provided benefits if Dr. Perez had an earnings loss due solely to Sickness.  The Policy called for a comparison of his post-Sickness earnings to his pre-Sickness earnings. Dr. Brodner's not-so-expert opinion was that Dr. Perez was not unable to perform his duties as an ophthalmic surgeon because Dr. Perez reported in his medical records that he was performing ophthalmic surgery.

statements, including its final Rule 26 disclosure served less than a month before the close of discovery. (Doc. 258-2 at 21, 34). All three Rule 26 disclosures identified the insurance policies and MONY's claim file as the documentary evidence relied upon by MONY. (Doc. 258-2 at 9, 21, 33)

Dr. Perez deposed MONY's witnesses regarding its overpayment claim. The claims personnel, when asked, testified they had no claim calculation other than the one they originally performed showing Dr. Perez was entitled to the benefit. Specifically, the Director of Claims, Carol Walsh, CPA, who authorized the payment of Dr. Perez's claims, testified in her deposition that MONY had no calculation showing Dr. Perez was not entitled to the benefits under the Policy. (Doc. 233, at 146) Walsh admitted that she never detailed to the insured what expenses MONY was claiming were inappropriate, despite request from Dr. Perez's accountant. (Doc. 223, at 141). Similarly, Claim Consultant, Brian Hayes, who calculated Dr. Perez's earnings loss and percentage of earnings loss for the 2015-2018 period, testified that he never went back and determined his calculations were incorrect nor did he identify any expenses that he would consider not deductible business expenses. (Doc. 227, at 23-24) Finally, Dr. Perez deposed the Vice-President of Claim Operations, Ronald Fehrman, Jr., on the last day of the discovery period. When asked, "Do you have any information that there is a single dollar of overpayment to Dr. Perez?," Fehrman testified, "I'm not sure we have enough information to

confirm that yet." (Doc. 319, at 151). Fehrman also admitted that he had no calculation in his possession as to what money he thought Dr. Perez owed MONY. (Doc. 319, at 151). Again, this was the last day of the discovery period.

MONY waited until the week before discovery closed to depose Dr. Perez, his brother Don Perez, his sister Maggie Whidden, and his accountant. John Magliano, CPA. The depositions of these witnesses were characterized by the use of documentary evidence that was never previously disclosed in any of MONY's Rule 26 disclosures. Of the 77 exhibits presented by MONY at Dr. Perez's deposition, only 9 documents had previously been disclosed. (Doc 332, at 3). MONY ambushed sister, Maggie Whidden, with 24 previously undisclosed documents, and brother, Don Perez, with 3 previously undisclosed documents. These documents related to transactions occurring in 2008 and 2010, more than a decade earlier, and not within the scope of MONY's pleadings. In addition, MONY used photographs and text messages it had mined from the iPhone of Dr. Perez's ex-girlfriend, Christina Smith, and again never previously disclosed in discovery. (See Doc. 332)

MONY also failed to timely disclose either Dr. Brodner or John Hoffman, CPA, as expert witnesses. MONY waited until the day expert reports were due and filing a motion to extend the deadline. (Doc. 104) The district court denied MONY's request for an extension of time to disclose its experts, finding it dilatory. (Doc. 106) MONY then disclosed Brodner and Hoffman as rebuttal experts pursuant to Fed. R.

Civ. P. 26(a)(2)(D)(ii) exactly thirty (30) days after the original deadline. (Doc. 262-3 and 262-5) Dr. Brodner candidly stated, however, that he was not rebutting any report served by Dr. Perez. (Doc. 262-3, at 3) Hoffman did not even pretend to be a rebuttal witness in his report. (Doc. 262-5)

Prior to trial, Dr. Perez moved to exclude the undisclosed evidence and undisclosed damages computation. (Doc. 332) He also moved in limine to prevent MONY from presenting its rebuttal experts in its case-in-chief, (Doc. 311), or from presenting Dr. Brodner at all since his opinion was only relevant to total incapacity. (Doc. 333) A few weeks prior to trial, the district court granted Dr. Perez's Motion in Limine Regarding Untimely Expert Opinions, finding that Brodner and Hoffman may only testify as rebuttal experts and may not offer expert testimony in MONY's case-in-chief. (Doc. 377, at 4) Moreover, the district court granted Dr. Perez's Motion in Limine Regarding David C. Brodner. (Doc. 377, at 4) The district court stated, "[t]he p[arties agree that total incapacity is not an issue in this case, rendering irrelevant any testimony offered by Dr. Brodner to that effect." (Doc. 377, at 4). Finally, the district court denied Dr. Perez's Motion in Limine Regarding Undisclosed Evidence, stating "[w]ith Dr. Perez having personal knowledge of the otherwise undisclosed deposition evidence and the facts underlying MONY's theory of damages developed during discovery, the admission of this evidence is harmless

and need not be excluded under Federal Rule of Civil Procedure 37(c)(1)." (Doc. 377, at 4)

On the morning trial began, the district court denied MONY's request to reconsider the exclusion of Hoffman and Brodner in its case-in-chief. (Doc. 441, at 4-5). The district court explained that their reports were late and that whatever factual testimony they had to offer was not helpful nor relevant. (Doc. 441, at 4-5). The parties selected a jury and prepared to go to lunch, whereupon MONY again asked to reconsider Hoffman and Brodner as witnesses. (Doc. 441, at 98). The district court indicated that it would consider the matter but "[r]ight now you should anticipate that your ore tenus motion you just made will be denied." (Doc. 441, at 98). Upon returning from lunch, the district court apologetically explained to Dr. Perez's counsel that he was flip flopping around like a weathervane and did not want to exclude witnesses based on a "procedural default." (Doc. 99) He stated, "I'm reversing my decision to declare them only as rebuttal experts. So I'm sorry about that." (Doc. 441, at 100-101) At this point, Dr. Perez reminded the district court that, in addition to the timeliness of disclosure, the district court had also granted Dr. Perez's motion in limine excluding Brodner's opinion as it was only relevant to total incapacity. (Doc. 441, at 101) The district court responded, "[a]nd that's kind of stipulated to, but I'm going to let them put on that doctor, like I said before, and you

can cross-examine him and say, well, your opinion is, you know, on Mars and we're

here on Earth." (Doc. 441, at 101)

In opening statement, counsel for MONY advised the jury that MONY was

claiming $388,000 in alleged overpayments. In cross-examination of Carol Walsh,

the following exchange occurred:

> Q Okay. So if this lawsuit was filed against Dr. Perez in August of '19, that would have been when you were the claim consultant on this case?
>
> A Yes.
>
> Q And at the time Dr. Perez was sued in this case in August of '19, did you have some computation that Dr. Perez had been overpaid?
>
> A I don't recall.
>
> Q In 2021, do you recall we took your deposition in this case?
>
> A Yes.
>
> Q At the time we took your deposition in 2021, did you have some computation that Dr. Perez had been overpaid by DMS?
>
> A I don't recall.
>
> Q Did you ever furnish a calculation or a computation to Dr. Perez in this case showing that his earnings calculation was an overpayment?
>
> A I would say, no, we didn't, as we were trying to obtain additional documentation to make that actual determination.
>
> Q All right. And do you know whether any time prior to opening statement in this trial, a number of 388,000 had ever been furnished to Dr. Perez or any of his lawyers as to what Disability Management Services is claiming on behalf of MONY?
>
> A Not to my knowledge.

Q As you sit here today, do you have some calculation or computation that tells us to what extent Dr. Perez has been overpaid since 2015?

A I think that calculation was made of what benefits were paid from August of '15 through January of '18.

Q So you are asking for 100 percent of the benefits from 2015 to 2018? Is that what you are telling this jury?

A Based on the information that we have to date, that is our best estimate, yes.

Q And you don't have an earnings calculation showing you're entitled to that?

A Again, we haven't gotten the documentation to support that loss beyond August of '15.

(Doc. 443 at 188-189)

*Dr. Perez Seeks Summary Judgment*

Dr. Perez moved for summary judgment on his breach of contract claim and on MONY's affirmative claims. Dr. Perez argued that there was no construction of the Policy authorizing MONY to audit its insured nor demand an audit as a condition of processing benefits claims. Dr. Perez further pointed to the testimony of MONY's witnesses that there was no alternative claim calculation nor evidence of any overpayment. Both parties sought summary judgment on MONY's ERISA preemption defense.

In his affirmative motion, Dr. Perez pointed out to the district court that the interpretation of an insurance contract was a question of law for the court, (Doc. 259, at 3), that there was no interpretation of the Policy that authorized MONY to demand

an audit, let alone to condition its processing of further claims for benefits on acquiescence to its extra-contractual demands. Dr. Perez argued that MONY's attempt to impose new post-loss conditions on its insured was contrary to the Policy and Florida law, that the Policy unambiguously specified the claim forms that Dr. Perez was required to submit, that compliance with the Policy's provision for submitting proof of loss entitled Dr. Perez to a decision on his claim, and that MONY breached the Policy when it sent its May 31, 2018 letter to the insured advising that it would not provide any further benefits under the Policy absent Dr. Perez complying with its audit of all prior claims since June 2011. Dr. Perez additionally argued that, by denying his claims on grounds other than the sufficiency of proofs of loss, MONY waived its right to contest the sufficiency of the proofs.

Dr. Perez also moved for summary judgment on MONY's affirmative claims. Dr. Perez argued that it was undisputed that there was an express contract between the parties, which barred MONY's action based on unjust enrichment and restitution. Dr. Perez argued that MONY's claim to relitigate 77 prior insurance claims that were paid without a reservation of rights was "wildly unprecedented" as MONY made no claim of fraud nor newly discovered evidence. Moreover, Dr. Perez pointed out that MONY refused to identify a single monthly benefit period, a single allegedly inflated expense, or a single calculation showing that a benefit was improperly paid. Dr. Perez pointed to MONY's Rule 26 disclosures setting forth no damages

calculation nor the supporting information required. Dr. Perez pointed to the testimony of Walsh, Hayes, and Fehrman that they had no overpayment calculation and no evidence of a single dollar of overpayment. Dr. Perez argued that Florida Statutes § 627.426 made final claim payment to the insured prejudicial to the insurer.

Similarly, Dr. Perez argued that there was no evidence that he appreciated any benefit being conferred on him to which he was not entitled. Dr. Perez pointed to every monthly benefit statement sent to him by MONY advising him that MONY was "pleased to send you the enclosed residual income loss benefit." (Doc. 259 at 25). Dr. Perez also asserted Florida's four-year statute of limitations to limit MONY's claim to only those benefits paid since August 2015. (Doc. 259 at 25)

The district court agreed with Dr. Perez on MONY's ERISA preemption defense and eliminated ERISA issues from the case. It also denied MONY's and DMS's motion for summary judgment on fraud, finding that fraud was normally a factual question for the jury. The district court denied Dr. Perez's motion for summary judgment in a docket entry order, stating "[t]here is no lucid, controlling Florida law on the precise contractual point, and the rest of the issues seem fact-bound." (Doc. 287)

At trial, MONY's corporate representative, Carol Walsh, admitted that there was nothing in the policy which required the medical practice to submit to a

complete audit of its patient records, financial data, production data, or anything of

that nature. (T. 189). Counsel asked:

> Q:      And the insurance company who writes insurance policies
> and has for, I don't know, over a century, they could write a paragraph
> in here saying we can audit you as much as we reasonably require while
> your claim continues, couldn't they?
>
> A      They could have, yes.
>
> Q      They didn't do that in this policy, did they?
>
> A      Not specifically.

At the close of MONY's case, Dr. Perez moved for a directed verdict on MONY's

unjust enrichment and restitution claims, which was denied without prejudice. (Doc.

447 at 229-233) Dr. Perez renewed his motion for directed verdict at the close of the

evidence on MONY's unjust enrichment claim and on Dr. Perez's breach of contract

claim, which the district court denied. (Doc. 449 at 74).

Dr. Perez asked the district court to instruct the jury that if it found there was

an express contract between the parties regarding when benefits are payable it could

not recover in unjust enrichment. (Doc. 374 at 25; Doc. 404, at 3) (Perez 1) The

district court refused the instruction.  (Doc. 449 at 188)

Dr. Perez also asked the district court to instruct the jury that "[t]he policy of

insurance issued by MONY to Dr. Perez does not authorize MONY to audit Dr.

Perez or his medical practice. If you find that MONY conditioned its obligation to

perform under the policy on Dr. Perez's acquiescence to an audit not authorized by the policy, you should find that MONY breached the contract." (Doc. 374 at 32) (Perez 8). Dr. Perez asked the district court to instruct the jury on his theory of the case, i.e., demanding performance from Dr. Perez that was not due under the policy as a condition of performing its obligations was a breach of contract. (Doc. 374 at 29) (Perez 5). Both of these instructions were refused, and instead the district court recast Dr. Perez's breach of contract claim as based on failure to pay benefits due since February 2018. (Doc. 449 at 190).

The jury returned a verdict in favor of MONY on its unjust enrichment claim, awarding MONY all of the benefits it paid within the limitations period. (Doc. 449 at 195) The jury's verdict was against Dr. Perez on his breach of contract case. (Doc. 449 at 195) Dr. Perez renewed his motion for judgment as a matter of law and alternatively asked for a new trial. (Doc. 428). In another docket entry order, the district court denied Dr. Perez's post-trial motion, (Doc. 433), having never addressed the contract issue on the merits.

This appeal timely followed.

## SUMMARY OF THE ARGUMENT

The district court abdicated its role to interpret the policy of insurance. Dr. Perez repeatedly asked the district court to determine whether the Policy authorized MONY to demand the audit of its insured. The district court, in a series of

unelaborated docket entry orders, denied it without prejudice, avoided it because there was no lucid, controlling law, or evaded it altogether. At trial, the district court refused to instruct the jury on the contract language, and, once again, ignored the question in a docket entry order on Dr. Perez's post-trial motion. Given that there never was a reasonable interpretation of the Policy authorizing MONY's unlawful demands, the district court's refusal to decide the issue resulted in an unnecessary but unfair trial. Had the jury been properly instructed that demanding an 11-year audit of the insured as a condition of its performance under the Policy was a breach of contract, the jury would not have found that it was "fair" for MONY to go back and recoup all prior claim payments.

The district court should also have directed a verdict on MONY's unjust enrichment claim. It should have granted summary judgment on this claim, and it should have granted Dr. Perez's motion to dismiss this claim, all on the basis that it was improper where there was indisputably an express contract between the parties spelling out "When We [MONY] Pay Claims." The contract was the sole source of the relationship between the parties. It specified that MONY paid claims only after "acceptable proof of loss" was provided. It had no provision for revisiting proofs of loss after they were accepted, particularly absent any express reservation of rights by MONY at the time it made payment. MONY's claim was unprecedented as a matter of Florida law, and contrary to Florida's Claims Administration statute, §

627.426 (setting forth which acts do not constitute a waiver by the insurer and omitting final payment).

The district court also erred in refusing to direct a verdict on Dr. Perez's voluntary payment and waiver defenses. MONY made payment without any reservation of rights, with full knowledge of Dr. Perez's salary, his production, his medical condition, and the expenses claimed by the practice. Moreover, MONY's personnel testified that when the company made payment without a reservation of rights it intended to waive any right to seek reimbursement of amounts already paid. This testimony was undisputed.

Finally, the district court's refusal to enforce basic rules of fairness mandates a new trial. MONY blatantly violated Rule 26, hiding the ball throughout the discovery period concerning its affirmative claims. It filed three Rule 26 disclosures without disclosing any damages computation or the basis therefor. It listed only the claim documents exchanged between the parties and copies of the insurance policies. Its witnesses all testified to having no other claim calculations other than the ones they produced showing Dr. Perez was entitled to the full benefits. At no time prior, during, or after trial did MONY produce any calculation that Dr. Perez had not suffered an Earnings Loss within the meaning of the Policy. Moreover, MONY intentionally waited until depositions it scheduled the last week of discovery to spring all of its documentary evidence on Dr. Perez's witnesses in deposition,

preventing Dr. Perez from investigating or making counter-disclosures on these points. MONY advanced, based on this information, new unpled theories that Dr. Perez was not actually an owner of his medical practice, causing the litigation at trial of transactions in 2008 and 2010 that the only witnesses said had been rescinded. This was manifestly prejudicial to Dr. Perez if, for no other reason, it was unpled and raised at the close of discovery. MONY's witnesses admitted at trial that the first time MONY set forth its damages computation was in opening statement. Rule 26, as implemented by Rule 37's sanctions, are designed to protect a party from such gamesmanship and chicanery. The district court's inability to enforce rules permitted MONY's medical expert to provide wholly irrelevant testimony regarding total incapacity, which MONY's counsel repeatedly used to mislead the jury at trial.

In short, the Court should interpret the policy and, if it is determined that MONY had no right to demand the audit, direct a verdict for breach of contract. It should also reverse the affirmative relief obtained by MONY or, at minimum, order a new trial with proper instructions and evidence.

## **ARGUMENT**

I.      THE DISTRICT COURT'S REFUSAL TO INTERPRET THE INSURANCE POLICY WAS ERROR MANDATING REVERSAL ON ALL ISSUES; THE POLICY COULD NOT REASONABLY HAVE BEEN INTERPRETED TO AUTHORIZE MONY'S DEMANDED AUDIT

Because federal jurisdiction over this matter is based on diversity, Florida law governs the determination of issues on this appeal. *Davis v. National Medical Enterprises, Inc.*, 253 F.3d 1314, 1319 n. 6 (11th Cir 2001) (citing *Insurance Co. of N. America v. Lexow*, 937 F.2d 569, 571 (11th Cir. 1991)).[5] Under Florida law, the interpretation of insurance contracts generally presents a question of law for the Court. *Lawyers Title Ins. Corp. v. JDC (America) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995) (citing cases) This Court reviews de novo the district court's interpretation of the insurance contract. *Id.*; *Gulf Tampa Drydock Co. v. Great Atlantic Ins. Co.*, 757 F.2d 1172 (11th Cir. 1985) ("[u]nder Florida law, the interpretation of an insurance contract is also a matter of law to be decided by the court, which is subject to plenary review.").

Despite many, many, many promptings by Dr. Perez, the district court altogether refused to interpret the policy and erroneously left the issue of policy interpretation to a jury of lay people. This was reversible error. In *Washington Nat. Ins. Corp. v. Ruderman*, 117 So.3d 943 (Fla. 2013), the Florida Supreme Court answered questions certified by this Court concerning the proper interpretation of insurance policies under Florida law. The Florida Supreme Court began, again, with

---

[5] In applying state law, this Court adheres to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise. *Id.*

the familiar maxim that construction of an insurance policy was a question of law subject to de novo review. 117 So.3d at 948. It next noted that "[w]here the language in an insurance contract is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning so as to give effect to the policy as written." *Id.* "[C]ourts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Id.* (citations omitted). The court went on to identify policy ambiguities where the language "is susceptible to more than one reasonable interpretation, one providing coverage and one limiting coverage." *Id.* (citations omitted).

In answering the certified question, the Florida Supreme Court rejected any notion that a court may resort to extrinsic evidence to interpret an insurance policy. *Id.* It held that where an ambiguity existed, the court was required to adopt the construction which favored the insured. *Id.* The court reiterated its prior admonition to insurance companies in drafting policies:

> As we noted in *Hartnett v. Southern Insurance Co.,* 181 So.2d 524, 528 (Fla.1965), where an insurance policy is "drawn in such a manner that it requires the proverbial Philadelphia lawyer to comprehend the terms embodied in it, the courts should and will construe them liberally in favor of the insured and strictly against the insurer to protect the buying public who rely upon the companies and agencies in such transactions." We recognize that "[u]nless restricted by statute or public policy, insurance companies have the same right as individuals to limit their liability and impose conditions upon their obligations." *Canal Ins. Co. v. Giesenschlag,* 454 So.2d 88, 89 (Fla. 2d DCA 1984). However, the insurance company has a duty to do so clearly and unambiguously.

*Ruderman*, 117 So. 3d at 951.

Applying the Florida Supreme Court's interpretive principles, and its "clear and unambiguous standard," there is no reasonable interpretation of the Policy which supports the proposition that an insured must acquiesce to an audit of his corporate medical practice, a non-party to the policy, as a condition of having his claims for benefits processed. MONY has struggled since 2018 to articulate one and admitted in its January 2018 correspondence with Dr. Perez's lawyer that there was no such provision in the policy. At trial, when MONY's corporate representative was asked in front of the jury whether the policy authorized an audit, Carol Walsh testified, "I don't know." Later, in MONY's rebuttal case, MONY would elicit from its own witness: "Did DMS ever tell Dr. Perez that the audit was specifically referenced in the policy? A. We did not." (Doc. 449 at 46) This case began with MONY filing its complaint for declaratory relief asking the Court to determine that MONY could condition processing of claims under the policy on Dr. Perez's acquiescence to its demanded audit. (Doc. 1) By the time of its rebuttal case in front of the jury, MONY was walking away from the assertion.

It was undisputed that MONY sent its May 31, 2018 letter to Dr. Perez advising that it would be unable to provide any further benefits to Dr. Perez absent his compliance with MONY's demanded audit. Dr. Perez filed an action for

declaratory judgment in state court seeking a declaration concerning whether the policy authorized such an audit. MONY later filed the instant action asking the district court to decide the exact same issue presented by Dr. Perez, i.e., whether the policy authorized an audit. At the first hearing before the district court, the district court was skeptical of MONY's interpretation of the insurance policy. The district court noted that MONY wrote the insurance policy and that it could have easily provided for an audit if it had wanted one in a single sentence. For his part, Dr. Perez motioned the district court to grant summary judgment against MONY multiple times, arguing there was no interpretation of the policy that authorized its retrospective audit. On the first occasion, the district court denied summary judgment "without prejudice."

In response to the district court's lack of enthusiasm for its interpretation, MONY amended its complaint to abandon the request for declaratory relief on the audit issue. Dr. Perez eventually countersued MONY for breach of contract, alleging that the demand for an audit not provided for in the policy was a breach of contract. After the close of discovery, Dr. Perez moved for summary judgment again on the policy intepretation. The district court once again refused to interpret the policy, instead issuing a docket entry order denying the motion and noting that there was no lucid, controlling Florida law on the question. The district court had failed to meet

its obligations under Rule 56 to make findings of fact and conclusions of law and had failed to decide what the policy meant.

Prior to trial, the parties were ordered to submit proposed jury instructions for the district court's consideration. Dr. Perez proposed that the jury be instructed that the policy did not provide for an audit of the insured and that the demand by MONY for performance not due by Dr. Perez was a breach of the policy. The district court refused to give either instruction to the jury or to instruct the jury at all concerning the meaning of the contract. The jury was never instructed on Dr. Perez's theory of the case, i.e., that MONY breached the contract by demanding an audit as a condition of further performance.

Finally, Dr. Perez moved for a directed verdict at the close of MONY's case, at the close of the evidence, and renewed same in a Rule 50 motion after verdict. On each such occasion, Dr. Perez asked and the district court refused to decide what the policy meant. Dr. Perez coupled his Rule 50 motion with a Rule 59 motion, arguing that the failure of the district court to interpret the insurance policy at least mandated a new trial on all issues.

The failure to properly instruct the jury regarding the proper interpretation of the Policy resulted in a fundamentally unfair trial. The jury was allowed to believe that it could return money to MONY if it was "fair" to do so without being told that the policy did not authorize its audit and that it was improper for MONY to demand

it. The district court's failure to interpret the policy left the jury to wonder whether

MONY had such a right or whether Dr. Perez was within his rights in standing on

the policy language.

This Court should reverse the final judgment, direct entry of judgment in favor

of Dr. Perez on liability, or, alternatively, order a new trial.

II.    THE DISTRICT COURT'S ENTRY OF FINAL JUDGMENT
       ON MONY'S UNJUST ENRICHMENT CLAIM WAS ERROR
       WHERE THERE WAS AN EXPRESS CONTRACT FOR THE
       PAYMENT OF BENEFITS, VOLUNTARY PAYMENT BY
       MONY UNDER THE CONTRACT, AND WAIVER OF
       MONY'S RIGHT TO CLAIM REIMBURSEMENT

A.    **Unjust enrichment cannot lie where there is an express
      contract between the parties on the subject matter**

MONY sued Dr. Perez alleging there was an express contract between

the parties and that the construction of the contract would resolve the dispute

between the parties. (Doc. 1, ¶¶ 5, 38—48). MONY added claims for unjust

enrichment and restitution in amended pleadings asserting quasi-contract

claims based on its actions in performing the contract between the parties. The

express contract bars MONY's claim for unjust enrichment as a matter of law.

*See Diamond "S" Development Corp. v. Mercantile Bank*, 989 So. 2d 696, 697

(Fla. 1st DCA 2008)

(reversing judgment for unjust enrichment where there was a contract

between the parties concerning the same subject matter). Despite the clear bar

to relief, the district court denied without a written order Dr. Perez's motion to

dismiss, motion for summary judgment, motion for directed verdict, and Rule 50(b) and Rule 59 motions. (Docs. 47, 287, and 433). This Court should reverse and remand for entry of judgment in favor of Dr. Perez on Counts II and III of MONY's Third Amended Complaint.

This Court has recently instructed that when an express contract sets forth the respective obligations of each party there can be no claim for unjust enrichment. *Glob. Network Mgmt., LTD. v. Centurylink Latin Am. Sols., LLC*, 67 F.4th 1312, 1317 (11th Cir. 2023); see also *Wilson v. EverBank, N.A.,* 77 F.Supp.3d 1202, 1220 (S.D. Fla. 2015) (unjust enrichment claim precluded by the existence of an express contract between the parties concerning the same subject matter); *Berry v. Budget Rent-A-Car Systems, Inc.*, 497 F. Supp. 2d 1361, 1369-1370 (S.D. Fla. 2007) (unjust enrichment and restitution claims barred upon a showing that an express contract exists).

In *Centurylink*, the parties had various contracts governing the parties' relationship, including the security responsibilities of Centurylink to safeguard Global Network's servers and memory cards. *Glob. Network Mgmt., LTD.,* 67 F.4th at 1316. Global Network attached the contracts to its complaint and alleged they were binding on both parties. *Id.* Despite alleging the existence of an express contract, Global Network asserted an unjust enrichment claim. *Id.* at 1316. Global Network alleged that it paid

CenturyLink for security services that were not provided, and it would be inequitable for CenturyLink to retain funds paid since it did not provide the security. *Id.* at 1317.

This Court rejected that claim, *Id.* at 1317—18, explaining that Florida law prohibits a quasi-contractual claim when there is an express agreement governing the parties' relationship. *Id.* at 1317 (citing *Diamond "S" Development Corp*, 989 So. 2d at 697 ("Florida courts have held that a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter."); *Ocean Communications, Inc. v. Bubeck*, 956 So. 2d 1222, 1225 (Fla. 4th DCA 2007) ("A plaintiff cannot pursue an equitable theory, such as unjust enrichment or quantum meruit, to prove entitlement to relief if an express contract exists."); 42 C.J.S. Implied Contracts § 62 (2023 update) ("[F]or a court to award a quantum meruit recovery, the court must conclude that there is no enforceable express contract between the parties covering the same subject matter."))

This Court rejected Global Network's claim since Global Network "made payments pursuant to a contract that addressed the matter of security" and Global Network did not allege that it paid any *additional* money over and above what was proscribed by the parties' contract. *Id.* at 1318. Global Network could not "now demand higher security measures than those that were

bargained for. See 42 C.J.S. Implied Contracts § 60 (2023 update) ('[A] court may not make a better contract for the parties through an unjust enrichment claim than they have made for themselves.')" *Id.*

In the instant case, MONY has argued that its claims were "outside the ambit of the contract," (Doc. 45, at 16-17), but the record conclusively establishes that whether benefits were due or not and whether acceptable proof of loss was submitted before payment was made were exclusively governed by the Policy. The fact that the Policy may not afford MONY a mechanism to audit prior paid claims for the purpose of redetermining coverage years later is not a reason to allow an unjust enrichment remedy or imply a contract. To the contrary, it is precisely why such a theory cannot be used to circumvent, supplement, or supplant the provisions actually contained in the contract.

One of the reasons the existence of an express contract precludes an unjust enrichment claim is that discharge of a party's contractual obligation cannot be the conferral of a benefit on the party receiving performance. See *American Safety Ins. Serv., Inc. v.* Griggs, 959 So.2d 322, 331-332 (Fla. 5th DCA 2007) (unjust enrichment claim fails where adequate consideration given for benefit conferred). In the instant case, the very subject matter of the contract was the payment of premiums for the making in return of cash payments for residual income loss upon receipt of "acceptable proof of loss."

Dr. Perez contracted for the cash payments in the event of certain specified occurrences (total incapacity or residual income loss) as determined under certain specified conditions (MONY's receipt of "acceptable proof of loss"). MONY evaluated the medical and financial information and made each monthly payment to Dr. Perez **pursuant to the Policy's** "When We Pay Claims" provision, which provided:

> **When We Pay Claims** – First we need written proof of loss. **Upon receipt of acceptable proof of loss, we will pay all benefits due you at the end of each month while the benefit period continues.** Any balance not paid when the benefit period ends will be paid upon receipt of proper written proof.

(Doc. 1-2, at 7) (emphasis added). Each and every payment by MONY to Dr. Perez was made in contemplation of MONY's rights and Dr. Perez's rights under the express terms of the Policy. Whether a "benefit" was conferred on Dr. Perez, or whether MONY merely performed that which the contract required it to perform, was dependent solely upon the terms of the Policy. MONY cannot seriously argue that the express terms of the contract do not control not only whether a benefit was paid but when they are paid by MONY to Dr. Perez.

A second sound reason why the existence of an express contract forecloses an unjust enrichment claim is that the party receiving performance believed to be owed by the other party under the contract cannot be considered

as having appreciated a benefit. Once again, the facts of the instant case demonstrate the reason for the rule. With each monthly payment to Dr. Perez, MONY prepared and sent to Dr. Perez a Residual Income Loss Benefit Statement setting forth MONY's detailed determinations under the Policy concerning Dr. Perez's Prior Earnings, Current Earnings, Earnings Loss, Percentage of Earnings Loss, and the amount determined by MONY to be due solely to his disability. For each benefit period, MONY advised Dr. Perez "We are pleased to send you the enclosed Residual Income Loss benefit for the period shown below." The statement was accompanied by a check to Dr. Perez. Certainly, Dr. Perez cannot be considered to have appreciated an undeserved "benefit" when he received the performance by MONY of that which he contracted to receive in consideration of the payment of premiums to MONY for decades.

Finally, the third element of unjust enrichment, whether it would be inequitable and unjust for Dr. Perez to retain the benefit conferred on him, necessarily turns on the Policy. MONY does not seriously argue that this issue is not controlled by whether it owed Dr. Perez the monies it paid under the express terms of the Policy. To the contrary, MONY has argued extensively in this action that the sole issue presented by its unjust enrichment claim was whether there was coverage for residual income loss under the Policy. (Doc.

310 at 2) ("This case concerns one thing—residual disability benefits under the Policy."); (Doc. 300, at 9-10) ("identifying whether Dr. Perez's loss was "due solely" to his purported disabling condition and whether Dr. Perez suffered an earnings loss from August 2015 through January 2018 and, if so, how much, are issues of fact remaining to be litigated.")

Nor can unjust enrichment be used as a disguised misrepresentation claim not pled with particularity. The existence of fraud remedies are sufficient to protect insurance companies without implying some fictional contract between an insurer and insured other than the insuring forms approved by state regulators in this highly regulated context.

Coming full circle, MONY argued below that the Policy did not provide MONY the right to obtain reimbursement of already paid claims. The argument proves too much. Certainly, if reimbursement was not provided for in the Policy then it follows that the Policy does not provide for an audit of prior paid claims for the purpose of redetermining eligibility for and seeking reimbursement of those benefits. The district court found that MONY's claim for the recovery of benefits paid was "beyond the pale of the contract." (Doc. 448 at 180) When asked to direct a verdict in Dr. Perez's favor that demanding an audit to try and recover benefits paid was also beyond the pale of the

contract, the district court demurred. The rights claimed by MONY were, at best, mutually exclusive.

The district court erred in refusing to direct a verdict. Its conclusion that return of overpayments was not a remedy provided by the policy is not grounds to create such a remedy. Doing so is simply adding terms to the express contract that the parties did not negotiate for in making the contract. The district court should have removed unjust enrichment from the jury's consideration.

> **B.** **In the absence of fraud or mistake, Florida law does not allow an insurer to sue its insured to re-adjust an insurance claim; such a right would alter the risks both parties assumed in the insurance contract and inject uncertainty and litigation into every claims decision**

Florida's insurance industry is heavily regulated by Florida's Legislature and Office of Insurance Regulation ("OIR"). OIR has been tasked by the Legislature to oversee:

> [A]ll activities concerning insurers and other risk bearing entities, including licensing, rates, policy forms, market conduct, claims, issuance of certificates of authority, solvency, viatical settlements, premium financing, and administrative supervision, as provided under the insurance code or chapter 636.

§ 20.121(3)(a)1, Fla. Stat. A key function of the OIR is to approve the insuring forms and specific clauses included in policies issued in the state of Florida. The process requires filing and advance approval:

(1) A basic insurance policy or annuity contract form, or application form where written application is required and is to be made a part of the policy or contract, group certificates issued under a master contract delivered in this state, or printed rider or endorsement form or form of renewal certificate, may not be delivered or issued for delivery in this state unless the form has been filed with the office by or on behalf of the insurer that proposes to use such form and has been approved by the office or filed pursuant to s. 627.4102.

\* \* \*

(3) ***No insurer shall issue or use any form disapproved by the office***, or as to which the office has withdrawn approval, after the effective date of the order of the office.

§ 627.410, Fla. Stat. (emphasis added).

In order to assist OIR in its mission, the Legislature requires insurers to issue policies with standard forms that match the requirements of Florida's insurance code provisions. § 627.412, Fla. Stat. One of the most important provisions of Florida's insurance code, from the perspective of policyholders, is the requirement that every policy must "specify . . .. the risks insured against" and "the conditions pertaining to the insurance." § 627.413(1)(c), (f), Fla. Stat. This permits insureds to evaluate, before paying premiums, the scope of the coverage and the conditions that must be met to access a benefit when a loss occurs. Under Florida's positive law, a policy may not be issued upon a person unless the person insured "applies for and consents in writing to the contract and its terms." § 627.404(5), Fla. Stat. (2020). Similarly, for every policy of insurance issued in the state of Florida, the insurer is required to provide the

insured, upon request, forms for completion of proof of loss. § 627.425, Fla. Stat. These salutary provisions ensure that an insurer cannot change the risks of the policy after issuance or loss by imposing new conditions or proof of loss requirements not specified in the policy.

MONY's claims for unjust enrichment and restitution do not allege fraud or mistake. Instead, they asserted the right, after a claim has been made, investigated, and paid by an insurer, to recover the benefit paid by claiming that the insured obtained something to which he was not entitled. It is undisputed that this right is not contained in the Policy that defines the risks taken by the parties and was approved by the OIR. Moreover, MONY cannot cite any authority for the proposition that, absent fraud or payment by mistake, an insurer can re-open 77 paid monthly disability claims to retrospectively audit them and determine whether its original payment decisions were correct.

The Supreme Court of Utah addressed this question and rejected such a claimed right under Utah law. It was asked by the district court of Utah on a certified question whether an insurer possessed "a right to reimbursement or restitution against an insured?" *U.S. Fid. & Guar. Co. v. U.S. Sports*, 270 P.3d 464, 466 (Utah 2012). The court unanimously held that such a maneuver was not available to the insurer. The court's determination was grounded on two

pillars: (1) a claim for unjust enrichment or restitution "cannot arise where there is an express contract"; (2) an insurer may only seek restitution "when the right is expressly provided in their insurance agreement." *Id.*

The court began with the fundamental principle that Utah law prohibits extra-contractual claims (or quasi-contract claims) such as unjust enrichment or restitution where an express contract exists. *Id.* at 468. Even outside the insurance context, the court noted the strong public policy against allowing such claims since "allow[ing] such a cause of action in the face of an enforceable contract governing the parties' rights would effectively add or modify terms for which they had not bargained." *Id.* (citing *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew& Rental Tools, Inc.*, 246 S.W.3d 42, 50 (Tex. 2008)).

Next, the court turned to the Utah Insurance Code. Similar to Florida, Utah law requires insurers to "bargain for each term and express their agreement in written form." *Id.* at 469. The Utah Insurance Code required all agreements and terms to be included in the policy. *Id.* (quoting UTAH CODE § 31A-21-106(1)(a)). This ensures both sides understand what has been bargained for and the risk each side has incurred. *Id.* The court reasoned that insurers, by their nature, are entities that quantify and allocate risk on a daily basis. *Id.* As such, they are in a superior position to determine the risks under

each policy and issue such policies with the appropriate premium, as well as evaluate each claim presented and fairly evaluate and resolve the claim. *Id.* 470—71. Accordingly, the court held "an insurer may not seek restitution based on the extracontractual theory of unjust enrichment where there is an express contract" since to do so would alter the "the risk relationship of the insurer and the insured." *Id.*

Florida law mirrors Utah law in prohibiting quasi-contractual or equitable claims where there is an express contract. Similarly, Florida law mirrors Utah's regulatory scheme as it relates to the necessity of defining the risks between insurer and insured. Just like Utah's Insurance Code, § 627.410 and § 627.413 require insurers to present their forms to OIR including the terms they intend to rely on in their policies covering Florida insureds. And insurers must include ***every*** term they intend to rely upon in their applications to OIR. It runs contrary to Florida public policy that an insurer may issue a policy including specific terms, a specific premium, governing a specific risk, and then after the fact seek to re-adjust that relationship extra-contractually in order to reduce its exposure. It is equally improper to imply a contract between the parties that has not been subjected to regulatory scrutiny.

This Court should predict that Florida would adopt the reasoning of the Utah Supreme Court and reject unjust enrichment claims seeking to

redetermine benefits already paid under an insurance contract. Such a claimed right is foreign to insurance law and imposes on the insured the very thing the insured purchased the insurance to avoid – uncertainty regarding his income in the event of a disability.

### C. The district court erred in refusing to direct a verdict in Dr. Perez's favor based on the voluntary payment doctrine

MONY alleged that Dr. Perez was unjustly enriched through the receipt of benefits to which he was not entitled, and MONY alleged that Dr. Perez appreciated and was aware, through correspondence and in-person contacts from MONY, that the disability benefit payments he received constituted a benefit to which he was not entitled. Under MONY's theory of the case, however, so too was MONY when it voluntarily made the payments.

The record establishes that MONY was provided, on a monthly basis, Dr. Perez's production, Don Perez's production, Dr. Perez's salary, Don Perez's salary, and the expenses claimed to have been incurred by the practice. MONY obtained every medical record generated for Dr. Perez from 2011 to February 2018, without exception, and interviewed Dr. Perez on several occasions, including the occasion referenced in the complaint. MONY repeatedly asked questions of the practice's accountant and, importantly, claimed *all along* that the information furnished by the insured and the practice was incomplete or doubtful as to his entitlement to benefits under the Policy. Despite its repeated protestations and assertions of unclear liability,

MONY assessed its rights under the contract and made payment to Dr. Perez without a reservation of rights until finally claiming, a year after litigation began, that Dr. Perez was unjustly enriched.  According to MONY, it should have been clear to Dr. Perez from its communications with him that he was receiving a benefit to which he was not entitled.  Under its own theory of the case, it was equally clear to MONY when it was making the payments based on those same communications.

To the extent that MONY's claim was that Dr. Perez was unjustly enriched because his medical condition had improved and he was no longer incurring losses solely due to disability, MONY had unfettered access to Dr. Perez's medical records and the right, under the Policy, to evaluate his condition as much as it pleased. Instead of exercising that right, it chose to obtain a records review by Dr. Brodner and, according to MONY, Dr. Brodner opined that Dr. Perez had no restrictions or limitations from his condition. Clearly, MONY did not, nor could it, point to anything about his medical condition that was unknown to it.

The district court should have directed a verdict on Dr. Perez's voluntary payment defense.

### D.     MONY intentionally waived its right to seek reimbursement when it paid Dr. Perez without a reservation of rights; the district's court failure to direct a verdict in favor of Dr. Perez based on waiver was similarly error.

Dr. Perez presented the testimony of the Vice-President of Claim Operations, Ronald G. Fehrman, Jr., who testified that when MONY made a claim payment

without a reservation of rights it intended to waive its right to seek reimbursement

of that payment should the facts later turn out to be different than expected. The

testimony of Fehrman was dispositive on the issue of waiver, and the district court

erred in refusing to direct a verdict based on waiver, at least with respect to all claims

payments except the last one covering the January 2018 period. The January 2018

payment was the only payment made with a reservation of rights, demonstrating that

MONY knew exactly how to reserve its right to seek reimbursement when it wanted

to do so.

When asked to explain a payment under a reservation of rights, Fehrman

testified:

> A      Well, there is a couple of different reservations of rights.
> One is a reservation of rights that states that we're not done with our
> evaluation, we're continuing to evaluate.  Regardless, we're going to
> release benefits, and you can go ahead and feel free to cash the proceeds
> as – even if at the end of our evaluation you're deemed not eligible for
> the benefits, we're not going to attempt to require reimbursement.
>      The second type would be a reservation of rights where we make
> payment and state that at the end of the course of our evaluation, or
> upon receipt of whatever was outstanding, we determine that – that you
> weren't entitled to the benefits that were paid, that we reserve the right
> to the seek reimbursement of those benefits.

> Q      Any – any other types of payments made under a
> reservation of rights by DMS?

> A      I – not that I know of.

> *          *          *          *          *

47

Q     All right.  And in the first reservation of rights category, you're intending to convey to the insured that you're reserving DMS' rights as it relates to future benefit periods, but waiving those rights with respect to the payment being made on that day, correct?

A     Yeah, the only – the only thing under that situation is that we're – we're – we're waiving our right – the only right we're waiving is we're waiving our right to seek reimbursement of the benefits that have been paid.  We're not waiving any other rights of the policy.

Q     In a circumstance in which you make a claim payment without any reservation of rights, is it your intention to waive the right of reimbursement?

A     Obvious at that point in the claim, yes, we weren't – wouldn't be intending to seek reimbursement.

(Doc. 485 at 4-8).

The testimony of Fehrman was clear, precise and unequivocal that MONY intended to waive any right to seek reimbursement when it made payments to the insured without an express reservation of rights. It was only in those circumstances where MONY paid under a reservation of rights and expressly advised the insured that it was reserving the right to seek reimbursement that MONY could seek reimbursement. The district court, when asked to direct a verdict on waiver on this unrefuted testimony, simply stated that "those issues of waiver and voluntary payment I think are incredibly contested and vigorously so on both sides." The district court did not identify any record evidence disputing Fehrman's testimony.

It should have directed a verdict on waiver.

### III. THE DISTRICT COURT ABUSED ITS DISCRETION IN OVERLOOKING MONY'S REPEATED ABUSE OF THE PRETRIAL PROCESS AND ALLOWING IRRELEVANT MEDICAL EXPERT TESTIMONY

The Federal Rules of Civil Procedure protect a party from trial by ambush. Rule 26 mandates a complete and total disclosure of all documents, ESI, and tangible things that the party has in its possession, custody or control and may use to support its claims or defenses. Fed. R. Civ. P. 26(a)(1)(A)(ii). It also mandates disclosures of "a computation of each category of damages claimed by the disclosing party— who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered." Fed. R. Civ. P. 26(a)(1)(A)(iii). A party must supplement its disclosure with additional or corrective information in a timely manner and during the discovery process. Fed. R. Civ. P. 26(e)(1)(A).

According to the Advisory Committee Notes, the obligation to disclose arises when a party intends to "use" a document. "'Use' includes any use at a pretrial conference, to support a motion, or at trial. The disclosure obligation is triggered by intended use in discovery, apart from use to respond to a discovery request; use of a document to question a witness during a deposition is a common example." Advisory Committee Notes to Fed. R. Civ. P. 26 (2000 Amendments); *see also*

*Bryant v. Norde*, 2018 WL 4378165 (E.D. N.Y. 2018) (the concept of "use" is defined broadly and discovery obligations exist to avoid ambush and unfair surprise). The obligation to disclose information intended to be used "connects directly to the exclusion sanction of Rule 37(c)(1)." *Id.*

For violations of Rule 26(a) or (e), Rule 37 prohibits a party from *using* the information not disclosed unless the failure was substantially justified or harmless.

The district court did not find that MONY complied with Rule 26 or that its non-compliance was substantially justified. Instead, the district court refused to sanction MONY on the grounds that its non-compliance was "harmless." This was an abuse of discretion under the unique facts of this case. From the outset, MONY's claim was vaguely pled. Its interrogatory answers merely referred Dr. Perez back to its complaint. MONY's witnesses had no information to add on its affirmative claims, failing to identify a single expense or other item challenged. MONY disclosed no damages computation and never provided an alternative cause of loss or earnings calculation. To say, under these circumstances, that withholding its entire theory until ambush depositions at the close of discovery was harmless is to render the requirement of disclosure an unenforceable nullity. Dr. Perez's counsel learns what damages are claimed by MONY in counsel's opening statement. In fact, because MONY still had no overpayment analysis, it merely stood up and asked for all benefits paid to Dr. Perez.

The late disclosure injected into the case, for the first time, MONY's unpled theory that Dr. Perez was not an owner of his medical practice in 2011 when he was diagnosed with cancer. This new evidence, dumped on the eve of discovery cut-off, involved transactions from 2008 and 2010 that were the subject of collateral litigation between Dr. Perez and his ex-wife. Dr. Perez objected to all of this late-disclosed evidence because he was unable to counter any of it before the close of discovery or ask a single MONY witness about it. Dr. Perez and his brother testified that the transaction was rescinded after the ex-wife sued Dr. Perez; however, that did not stop MONY from misleading the jury with it.

Similarly, MONY mined the iPhone of Dr. Perez's ex-girlfriend and began using undisclosed photographs and text messages during his deposition and that of his brother. The ones selected by MONY were cherry-picked, and at no time did MONY produce to Dr. Perez any photographs or messages it did not select to use. MONY gave no good explanation for sandbagging, and the district court found none. The entire effort was intended to and did have the effect of giving MONY a procedural advantage by leaving Dr. Perez unable to test MONY's evidence in discovery, unable to designate countervailing exhibits, and unable to obtain discovery of other information obtained by MONY from Smith.

In addition, MONY was permitted to present the testimony of Dr. Brodner that was wholly irrelevant to the disputed issue at trial, despite late disclosure and

despite the district court's determination that the testimony was "irrelevant." Again, the district court would not enforce its prior ruling that Brodner was late-disclosed nor its prior ruling that his testimony was irrelevant. Instead, after the jury was selected, the district flip flopped and then advised counsel for Dr. Perez that he could cross-examine Brodner regarding his opinion being from Mars when we are here on Earth. Not surprisingly, MONY repeatedly emphasized to the jury throughout the trial how its board-certified ENT had proved Dr. Perez was not entitled to the benefits, despite Brodner testifying at trial that he had no opinion concerning the volume of work Dr. Perez could do compared to his pre-Sickness levels.

The Court should find that the district court abused in discretion in refusing to grant Rule 37 sanctions, in refusing to grant a new trial based on MONY's sanctionable conduct, and in allowing Dr. Brodner to testify at all.

## CONCLUSION

For the foregoing reasons, Dr. Perez asks this Court to reverse the final judgment, enter judgment in his favor, or, alternatively, order a new trial. Dr. Perez requests such other and further relief as the Court deems proper.

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that:

1.    This document complies with the type-volume limitation of FRAP 32(a)(7) because, excluding the parts of the brief exempted by FRAP 32(f), this brief contains 12,737 words.

2.    This document complies with the typeface requirements of FRAP 32(A)(5) and the type-style requirements of FRAP 32(a)(6), in that it was prepared using a Times New Roman 14 font.

    _s/ *Timothy W. Weber*_____
Timothy W. Weber, Esq.
FBN: 86789

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 30, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to: John Meagher, Esq. (jmeagher@shutts.com) and Jake Monk, Esq. (jmonk@shutts.com), Shutts & Bowen, LLP, 200 S. Biscayne Blvd., Suite 4100, Miami, FL 33131.

_s/ *Timothy W. Weber*_____
Timothy W. Weber, Esq.
FBN: 86789
Board Certified Appellate Specialist
Jeremy D. Bailie, Esq.
FBN: 118558
WEBER, CRABB & WEIN, P.A.
5453 Central Avenue
St. Petersburg, Florida 33710
(727) 828-9919; (727) 828-9924 (fax)
Counsel for Bernard R. Perez